No. 25-20243

# United States Court of Appeals for the Fifth Circuit

TROJAN BATTERY COMPANY, L.L.C.,

*Plaintiff—Appellee,*

v.

GOLF CARTS OF CYPRESS, L.L.C.; TROJAN EV, L.L.C.,

*Defendants—Appellants.*

On Appeal from the United States District Court
for the Southern District of Texas
Hon. George C. Hanks, Jr.
USDC No. 4:21-CV-3075

## OPENING BRIEF FOR APPELLANTS

Dana Livingston
dlivingston@cokinoslaw.com
COKINOS YOUNG, P.C.
900 S. Capital of Texas Hwy.,
Suite 425
Austin, Texas 78746
Telephone: (512) 482-9304
Facsimile: (512) 610-1184

Anthony T. Golz
agolz@cokinoslaw.com
COKINOS YOUNG, P.C.
Four Houston Center
1221 Lamar Street, 16th Floor
Houston, Texas 77010
Telephone: (713) 535-5500
Facsimile: (713) 535-5511

*Counsel for Defendants—Appellants,
Golf Carts of Cypress, LLC and Trojan EV, LLC*

No. 25-20243

# United States Court of Appeals for the Fifth Circuit

TROJAN BATTERY COMPANY, L.L.C.,

*Plaintiff—Appellee,*

v.

GOLF CARTS OF CYPRESS, L.L.C.; TROJAN EV, L.L.C.,

*Defendants—Appellants.*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may exercise possible disqualification or recusal.

| Defendants-Appellants: | **Golf Carts of Cypress, LLC**<br>**Trojan EV, LLC**<br><br>At all relevant times, Defendants-Appellants were owned by **Federico Nell** |
|---|---|
| Trial and Appellate Counsel: | Anthony T. Golz<br>agolz@cokinoslaw.com<br>COKINOS YOUNG, P.C.<br>Four Houston Center<br>1221 Lamar Street, 16th Floor<br>Houston, Texas 77010<br>Telephone: (713) 535-5500<br>Facsimile: (713) 535-5511<br><br>Dana Livingston<br>dlivingston@cokinoslaw.com<br>COKINOS YOUNG, P.C.<br>900 S. Capital of Texas Hwy., Suite 425<br>Austin, Texas 78746<br>Telephone: (512) 482-9304<br>Facsimile: (512) 610-1184 |
| Additional Trial Counsel: | Jerry R. Selinger<br>jselinger@pattersonsheridan.com<br>Susan E. Powley<br>spowley@pattersonsheridan.com<br>PATTERSON + SHERIDAN, LLP<br>1700 Pacific Avenue, Suite 2650<br>Dallas, TX 75201<br>Telephone: (214) 272-0957<br>Facsimile: (713) 623-4846<br><br>Aaron D. Perkins<br>aperkins@pattersonsheridan.com<br>Kyrie Cameron<br>kcameron@pattersonsheridan.com |

| | |
|---|---|
| | Simon J. Harrall<br>sharrall@pattersonsheridan.com<br>PATTERSON + SHERIDAN, LLP<br>24 Greenway Plaza, Suite 1600<br>Houston, TX 77046<br><br>William P. Ramey, III<br>wramey@rameyfirm.com<br>Kyril V. Talanov<br>ktalanov@rameyfirm.com<br>RAMEY LLP<br>5020 Montrose Blvd., Suite 800<br>Houston, TX 77006<br>Telephone:  (713) 426-3923<br>Facsimile:  (832) 900-4941<br><br>Henry James Fasthoff, IV<br>hank@fasthofflawfirm.com<br>FASTHOFF LAW FIRM PLLC<br>21 Waterway Ave., Suite 300<br>The Woodlands, TX 77382<br>Telephone:  (713) 929-9314 |
| **Plaintiff-Appellee:** | **Trojan Battery Company, LLC**<br><br>Plaintiff-Appellee is owned by<br>**C&D Technologies, Inc.** |
| Trial and Appellate Counsel: | Nicole K. McLaughlin<br>nkmclaughlin@duanemorris.com<br>Tyler R. Marandola<br>tmarandola@duanemorris.com<br>DUANE MORRIS, LLP<br>30 South 17th Street<br>Philadelphia, PA 19103<br>Telephone:  (215) 979-1000<br>Facsimile:  (215) 979-1020<br>Gilbert A. Greene |

| | bgreene@duanemorris.com<br>DUANE MORRIS, LLP<br>Las Cimas IV<br>900 S. Capital of Texas Hwy, Suite 300<br>Austin, TX 78746-5435<br>Telephone: (512) 277-2300<br>Facsimile: (512) 277-2301 |
|---|---|
| Additional Trial Counsel: | Katherine Ann Fillmore<br>katie.fillmore@michaelbest.com<br>MICHAEL BEST & FRIEDRICH LLP<br>515 Congress Avenue, Suite 2500<br>Austin, TX 78701<br>Telephone: (512) 409-2329 |

*/s/ Dana Livingston*
Dana Livingston

*Attorney of Record for Defendants—Appellants,*
*Golf Carts of Cypress, LLC and*
*Trojan EV, LLC*

iv

## Statement Regarding Oral Argument

Oral argument would help the Court resolve the issues presented arising from a four-day bench trial in which the district court ruled that Defendants are liable for trademark infringement and unfair competition, and also awarded Plaintiff over $4.7 million in total disgorged profits from Defendants under 15 U.S.C. § 1117(a) based on the court's conclusion that the infringement was "willful."

This appeal presents important questions, including whether Plaintiff has exclusive rights in the name "TROJAN" in any form and in connection with any product or service. The district court's permanent injunction has that effect. But Plaintiff makes and sells specialty batteries, including for use in electric golf carts. Defendants made and sold golf carts branded "Trojan-EV." Plaintiff chose not to introduce survey evidence, yet the district court found that there was "actual confusion" based on five anecdotal instances of alleged confusion. But such "isolated instances" cannot sustain the district court's likelihood-of-confusion finding here, especially when the alleged confusion could not and did not sway consumer purchases. *E.g.*, *Rampart Res., Inc. v. Rampart/Wurth Holding, Inc.*, No. 24-30111, 2025 WL 586820, at *5 (5th Cir. Feb. 24, 2025) (per curiam).

Defendants thus request that the Court set this case for oral argument.

# Table of Contents

Certificate of Interested Persons ...................................................... i

Statement Regarding Oral Argument ................................................ v

Table of Contents ........................................................................ vi

Table of Authorities ....................................................................ix

Jurisdictional Statement .......................................................... 1

Statement of Issues Presented for Review ................................. 2

Statement of the Case .................................................................. 4

    A.    Facts relevant to issues presented for review ...................................... 4

        1.    The parties (are not competitors) ............................................... 4

        2.    Federico Nell develops three related brands of electric golf carts: EV Titan, Trojan-EV, and Spartan-EV .......................... 4

        3.    TBC—despite having taken its own name from the USC Trojans—claims it has exclusive rights in the name "TROJAN" ............................................................................ 6

    B.    Relevant procedural history ............................................................... 7

    C.    Rulings presented for review ............................................................... 8

Summary of the Argument ....................................................... 10

Standards of Review ................................................................. 13

    A.    Findings of fact are reviewed for clear error, and conclusions of law are reviewed de novo ................................................................... 13

B.  The district court's award of disgorged profits is reviewed for an abuse of discretion ........................................................................... 13

C.  The district court's grant of a permanent injunction is reviewed for an abuse of discretion ................................................................ 14

ARGUMENT ....................................................................................................... 15

I.  The district court erred in finding Defendants liable for trademark infringement and unfair competition ......................................................... 15

A.  The district court's findings and conclusions are copied almost verbatim from TBC's proposed findings and conclusions ................. 15

B.  The district court's finding that there is a likelihood of confusion is clearly erroneous ........................................................................... 16

1.  *First Digit:  The type of trademark* ............................................. 18

2.  *Second Digit:  Mark similarity* .................................................... 23

3.  *Third Digit:  Product similarity* .................................................. 29

4.  *Sixth Digit:  Defendants' intent* .................................................. 32

5.  *Seventh Digit:  Actual confusion* ................................................. 43

6.  *Eighth Digit:  Care exercised by potential purchasers* ................... 47

II.  The district court erred in awarding TBC disgorged profits from Defendants under 15 U.S.C. § 1117(a) ......................................................... 51

A.  The district court erred in concluding that disgorgement is equitable under the *Pebble Beach* factors ............................................. 51

B.  The district court misallocated the burden of proving that any profits were attributable to the infringement ..................................... 54

1.      Section 1117(a) and *Mishawaka* establish a limited, rebuttable inference—not a wholesale shift of the attribution burden to defendants ............................................... 54

2.      The district court's misallocation of the attribution burden ran afoul of this Court's decisions ............................................ 56

3.      Defendants' evidence rebutted any inference that profits were caused by the use of "Trojan-EV," requiring denial or substantial reduction of disgorgement ................................. 59

III.    The district court's permanent injunction is overbroad and thus violates Federal Rule of Civil Procedure 65(d) ............................................ 61

CONCLUSION ................................................................................. 64

CERTIFICATE OF SERVICE ........................................................... 66

CERTIFICATE OF COMPLIANCE ................................................... 67

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*All. for Good Gov't v. Coal. for Better Gov't,*
  901 F.3d 498 (5th Cir. 2018) ....................................................... 63, 64

*AmBrit, Inc. v. Kraft, Inc.,*
  812 F.2d 1531 (11th Cir. 1986) .......................................................... 63

*Am. Rice, Inc. v. Producers Rice Mill, Inc.,*
  518 F.3d 321 (5th Cir. 2008).............................................................. 56

*Amstar Corp. v. Domino's Pizza, Inc.,*
  615 F.2d 252 (5th Cir. 1980)............... 16, 17, 18, 20, 22, 23, 24, 29, 33, 46, 47, 50

*Anderson v. City of Bessemer City,*
  470 U.S. 564 (1985).................................................................. 36, 37

*Appliance Liquidation Outlet, L.L.C. v. Axis Supply Corp.,*
  105 F.4th 362 (5th Cir. 2024) ....................................................... 34, 35

*Armstrong Cork Co. v. World Carpets, Inc.,*
  597 F.2d 496 (5th Cir. 1979)............................................. 13, 24, 46, 47, 48, 50

*Conan Props., Inc. v. Conans Pizza, Inc.,*
  752 F.2d 145 (5th Cir. 1985) ....................................................... 63, 64

*Diageo N. Am., Inc. v. Mexcor, Inc.,*
  661 F. App'x 806 (5th Cir. 2016) ...................................................... 63

*El Chico, Inc. v. El Chico Cafe,*
  214 F.2d 721 (5th Cir. 1954) ............................................................. 22

*Elvis Presley Enters., Inc. v. Capece,*
  141 F.3d 188 (5th Cir. 1998) ............................................................. 46

*Fontenot v. Mesa Petroleum Co.*,
  791 F.2d 1207 (5th Cir. 1986) ............................................................ 14

*Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*,
  754 F.2d 591 (5th Cir. 1985) ....................................................... 31, 50

*Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*,
  982 F.3d 280 (5th Cir. 2020) ................................ 20, 24, 28, 32, 33, 46, 47, 50

*Ill. Tool Works, Inc. v. Rust-Oleum Corp.*,
  955 F.3d 512 (5th Cir. 2020) ....................................................... 57, 58

*Logan v. Burgers Ozark Cty. Cured Hams Inc.*,
  263 F.3d 447 (5th Cir. 2001) ............................................................ 58

*In re Luhr Bros., Inc.*,
  157 F.3d 333 (5th Cir. 1998) ............................................................ 37

*Maltina Corp. v. Cawy Bottling Co.*,
  613 F.2d 582 (5th Cir. 1980) ............................................................ 56

*Marathon Mfg. Co. v. Enerlite Prods. Corp.*,
  767 F.2d 214 (5th Cir. 1985) ............................................................ 17

*Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*,
  316 U.S. 203 (1942) ................................................................. 55, 57

*Neutron Depot, L.L.C. v. Bankrate, Inc.*,
  798 F. App'x 803 (5th Cir. 2020) .................................................. 52, 53

*Oreck Corp. v. U.S. Floor Sys., Inc.*,
  803 F.2d 166 (5th Cir. 1986) ....................................................... 21, 48

*Peaches Ent. Corp. v. Ent. Repertoire Assocs., Inc.*,
  62 F.3d 690 (5th Cir. 1995) ........................................................ 13, 14

*Pebble Beach Co. v. Tour 18 I Ltd.*,
  155 F.3d 526 (5th Cir. 1998) .......................................... 13, 17, 54, 56, 59

*Quick Techs., Inc. v. Sage Grp. PLC,*
    313 F.3d 338 (5th Cir. 2002) ............................................................52

*Rampart Res., Inc. v. Rampart/Wurth Holding, Inc.,*
    No. 24-30111, 2025 WL 586820 (5th Cir. Feb. 24, 2025)
    (per curiam) ................................................................................. v, 47

*Retractable Techs., Inc. v. Becton Dickinson & Co.,*
    919 F.3d 869 (5th Cir. 2019)............................................. 51, 54, 58

*Rex Real Est. I, L.P. v. Rex Real Est. Exch., Inc.,*
    80 F.4th 607 (5th Cir. 2023) ........................ 17, 18, 23, 24, 29, 30, 44, 46, 47, 48

*Rex Real Est. I, L.P. v. Rex Real Est. Exch., Inc.,*
    No. 1:19-cv-00696-RP, 2022 WL 21739895 (W.D. Tex. May 18,
    2022), *aff'd in part, rev'd in part on other grounds,*
    80 F.4th 607 (5th Cir. 2023) ............................................................58

*Scott v. Schedler,*
    826 F.3d 207 (5th Cir. 2016) ...........................................................62

*Springboards to Educ., Inc. v. Hous. Indep. Sch. Dist.,*
    912 F.3d 805 (5th Cir. 2019).............................................................21

*Starter Corp. v. Converse, Inc.,*
    170 F.3d 286 (2d Cir. 1999) ...................................................... 63, 64

*Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.,*
    851 F.3d 440 (5th Cir. 2017)................................. 16, 17, 32, 33, 35, 36, 43, 49, 53

*Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n,*
    651 F.2d 311 (5th Cir. 1981) ................................. 20, 22, 23, 36, 47, 50

*Tex. Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc.,*
    951 F.2d 684 (5th Cir. 1992), *panel and en banc reh'g denied with
    opinion,* 966 F.2d 956 (5th Cir. 1992) .................... 36, 53, 56, 57, 58, 60

*Thamathitikhun v. Bank of Am., N.A.*,
    705 F. App'x 215 (5th Cir. 2017) ............................................................ 14

*TrafFixDevices, Inc. v. Mktg. Displays, Inc.*,
    532 U.S. 23 (2001) ................................................................................... 13

*Union Nat'l Bank of Tex., Laredo, Tex. v. Union Nat'l Bank of Tex.,*
    *Austin, Tex.*, 909 F.2d 839 (5th Cir. 1990) .......................................... 19

*United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*,
    848 F.3d 366 (5th Cir. 2017) .................................................................. 42

*Viacom Int'l v. IJR Cap. Invs., L.L.C.*,
    891 F.3d 178 (5th Cir. 2018) .................................................................. 24

*Westchester Media v. PRL USA Holdings, Inc.*,
    214 F.3d 658 (5th Cir. 2000) .................................................................. 62

*Zazu Designs v. L'Oreal, S.A.*,
    979 F.2d 499 (7th Cir. 1992) .................................................................. 22

**Statutes**

15 U.S.C. § 1117(a) ............................................................................ 51, 55, 61

15 U.S.C. § 1121(a) ...................................................................................... 1

28 U.S.C. § 1291 .......................................................................................... 1

28 U.S.C. § 1332(a)(1) ................................................................................ 1

28 U.S.C. § 1338(a)-(b) ............................................................................... 1

**Rules**

Fed. R. Civ. P. 65(d)(1) ......................................................................... 61, 62

Fed. R. Evid. 803(8, 14, 15) ....................................................................... 22

Fed. R. Evid. 807 ................................................................................22

**Other authorities**

Committee on Civil Pattern Jury Instructions,
   District Judges Ass'n of the Fifth Circuit,
   Pattern Jury Instructions (Civil Cases) Ch. 14
   *Trademark Infringement*, Instruction 14.25—Award of Defendants'
   Profits (2024)...............................................................................59

Merriam-Webster's Collegiate Dictionary  (10th ed. 1998) ...................................19

# Jurisdictional Statement

A.    The district court had subject-matter jurisdiction under the Lanham Act, 15 U.S.C. § 1121(a), and under 28 U.S.C. § 1338(a)-(b) (trademark and unfair-competition actions).   The district court also had subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) (diversity).

B.    This Court has jurisdiction over this appeal from a final decision under the Lanham Act, 15 U.S.C. § 1121(a), and under 28 U.S.C. § 1291.

C.    The district court entered its findings of fact and conclusions of law on March 28, 2024.  ROA.3727-3828.  After the bankruptcy stay was lifted in January 2025 (ROA.4007-08), Plaintiff filed a renewed motion for entry of permanent injunction on January 22, 2025 (ROA.4009-14), and Defendants filed an amended Rule 52(b) motion to amend findings and make additional findings on February 26, 2025. ROA.4293-4360.  The district court entered an order on May 6, 2025 granting Plaintiff's renewed motion for entry of permanent injunction and denying Defendants' amended Rule 52(b) motion.  ROA.4585-86.  The district court also entered a permanent injunction on May 6, 2025.  ROA.4587-90.  Defendants filed their notice of appeal on June 5, 2025.  ROA.4741-42.

D.    This appeal is from a final order or judgment that disposes of all parties' claims.

1

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.    Did the district court err in finding Defendants liable for trademark infringement and unfair competition, where the court erred in analyzing and weighing the digits of confusion, and its finding that there is a likelihood of confusion is clearly erroneous?

2.    Did the district court err in awarding TBC disgorged profits from Defendants under 15 U.S.C. § 1117(a), where the court erred in concluding that disgorgement is equitable under the *Pebble Beach* factors and its findings underlying that conclusion are clearly erroneous?

3.    Did the district court err in awarding TBC disgorged profits from Defendants under 15 U.S.C. § 1117(a), where: (a) the court improperly placed the burden on Defendants to prove that the profits were attributable to the Lanham Act violation, (b) TBC presented no evidence that any of Defendants' profits were attributable to the Lanham Act violation, and (c) Defendants' expert opined that if there were a finding of trademark infringement, the only supportable disgorgement number in the record is "zero"?

4.    Does the district court's permanent injunction violate Federal Rule of Civil Procedure 65(d), where the permanent injunction is overbroad because it is not

limited to golf carts, the golf industry, or even products in which TBC's batteries are used?

## Statement of the Case

**A.     Facts relevant to issues presented for review.**

**1.     The parties (are not competitors).**

Defendant-Appellant Golf Carts of Cypress, LLC (GCC) was a retail golf-cart dealer that sold new and used golf carts. ROA.3750 ¶¶62-63. Defendant-Appellant Trojan EV, LLC (Trojan EV) formerly made and sold Trojan-EV-branded golf carts, but only to authorized dealers. ROA.3751 ¶¶72-73. At all relevant times, GCC and Trojan EV (Defendants) were owned by Federico Nell. ROA.3750 ¶60.

Plaintiff-Appellee Trojan Battery Company, LLC (TBC), makes and sells specialty batteries, including batteries that can be used in electric golf carts. ROA.3730 ¶7. TBC has never made or sold golf carts and has no plans to do so in the future. ROA.5579, 5638-39.

**2.     Federico Nell develops three related brands of electric golf carts:  EV Titan, Trojan-EV, and Spartan-EV.**

Nell was introduced to the golf-cart business in February 2019 when a friend, Jose Fuentes, asked for help refurbishing and selling used golf carts. ROA.6064-66. Fuentes ran that "weekend" business out of his garage. *Id.* After some months of hands-on education and seeing the demand for used golf carts, Nell formed GCC in August 2019 and opened a small showroom in Cypress, Texas. ROA.3750 ¶¶62-63.

GCC later decided to add new golf carts to its inventory. Nell thus formed EV Titan, LLC in March 2020 and began sourcing golf carts from a manufacturer in China, to be sold under the brand "EV Titan." ROA.5994-95, 6744-47. Nell next formed Trojan EV, LLC in October 2020 and began sourcing different golf carts from a manufacturer in China, to be sold under the brand "Trojan-EV." ROA.3751 ¶72; ROA.3753 ¶82; ROA.6461-63. Finally, Nell formed Spartan EV, LLC and began sourcing golf carts to be sold under the brand "Spartan-EV." ROA.6077. GCC was an authorized retailer of all three brands. ROA.3751 ¶75.

The first Trojan-EV-branded golf carts were sold in January 2021. ROA.3754 ¶83. Nell had a LegalZoom search performed on "Trojan-EV" in March 2021 to determine whether there were trademarks with similar names. ROA.6437-50; ROA.6109, 6115, 6117-18. LegalZoom found several registrations, but none for TBC. ROA.6441-50. Nell then authorized the filing of federal trademark applications for the Trojan-EV mark and logo. ROA.6777-89; ROA.6202. The Trademark Examiner reported in November 2021 that the applications had passed substantive review.[1] ROA.6451-60; ROA.6203.

---

[1] Both applications were formally abandoned after the district court's decision. ROA.3855.

3.  **TBC—despite having taken its own name from the USC Trojans—claims it has exclusive rights in the name "TROJAN."**

TBC learned of Trojan-EV-branded golf carts in July 2021 through an email from Bill Malloy, a custom golf-cart dealer and long-time TBC dealer, joking about Trojan-EV-branded golf carts being "ugly." ROA.3756-57 ¶¶87, 91. Rick Sanders, a national account manager for TBC, forwarded Malloy's email to Bob Pigott, TBC's Vice President of Sales for North America, who forwarded it to in-house counsel. ROA.3757 ¶92.

The next day, TBC sent a cease-and-desist letter asserting a likelihood of confusion. ROA.6819-33. TBC had taken its own name from the University of Southern California (USC) Trojans, where a co-founder attended college. ROA.5650. Yet TBC's cease-and-desist letter claimed exclusive rights in the name "TROJAN." ROA.6824-25.

Trojan EV's counsel responded with a detailed letter in August 2021, explaining why there was no likelihood of confusion. Counsel pointed out the extensive third-party usage of "trojan," which made the mark "inherently weak." Because golf carts and batteries are in different classes and "consumers are capable of distinguishing between the multitudes of 'trojan' marks," Trojan EV "respectfully decline[d] to cease use of their TROJAN-EV mark." ROA.6466-68.

TBC then sued Defendants for trademark infringement and unfair competition. ROA.28. TBC also prayed for preliminary injunctive relief, ROA.43, but never sought such relief before trial.

### B.     Relevant procedural history.

Shortly before trial, the district court denied TBC's motion for partial summary judgment on liability, concluding that there were genuine material-fact issues as to whether (1) the Trojan-EV mark creates a likelihood of confusion; and (2) TBC possesses legally protectible trademark rights that extend to golf carts. ROA.3163.

The parties proceeded to a four-day bench trial. The district court later entered findings of fact and conclusions of law, ruling that (1) Defendants are liable for trademark infringement and unfair competition, (2) TBC is entitled to disgorgement of Defendants' profits under 15 U.S.C. § 1117(a), and (3) TBC is entitled to a permanent injunction. ROA.3727-3828.

Underlying the liability ruling was the conclusion that all eight "digits of confusion" weighed in TBC's favor. ROA.3776-3814. For instance, the court determined that the infringement was "willful" and there were five instances of "actual confusion." ROA.3800-11. "Willful" infringement was shown because Defendants "knew of the TROJAN® brand before they began selling golf carts"

(ROA.3801 ¶102) and because of their continued sales after receiving TBC's cease-and desist letter and being sued.  ROA.3804 ¶108.  The court also cited Trojan EV's development of a new model—the Trojan-EV-X model—when its supplier made the previous model used for Trojan-EV-branded golf carts exclusive to a competitor.  ROA.3805 ¶110; *see* ROA.3758 ¶99.  The court based the disgorgement award on its conclusion that there was "willful infringement."  ROA.3819 ¶152.

Because of the disgorgement award—over $4.7 million in total disgorged profits (ROA.3980-81)—Defendants filed a suggestion of bankruptcy.  ROA.3984-4001.  After the bankruptcy stay was lifted, TBC moved for entry of a permanent injunction.  ROA.4009-14.  The district court overruled Defendants' objections (ROA.4023-40) and entered the form of TBC's proposed injunction order.  ROA.4585-90.  The district court also denied Defendants' amended Rule 52(b) motion, which primarily challenged the disgorgement award.  ROA.4293-4360; ROA.4585-86.

### C.    Rulings presented for review.

This appeal challenges the district court's rulings reflected in its (1) findings of fact and conclusions of law (ROA.3727-3828), (2) order granting TBC's renewed motion for entry of permanent injunction and denying Defendants' amended Rule

8

52(b) motion to amend findings and make additional findings (ROA.4585-86), and

(3) permanent injunction (ROA.4587-90).

## Summary of the Argument

The district court found that there is a likelihood of confusion and ruled that Defendants are liable for trademark infringement and unfair competition under the Lanham Act and Texas common law. The court concluded that the eight "digits of confusion" recognized in this Circuit weigh uniformly in favor of a finding of likelihood of confusion. That was error. At best for TBC, only the fourth and fifth digits—outlet, purchaser, and advertising media identity—do. The remaining digits—especially those having special importance, the sixth (Defendants' intent) and seventh (actual confusion)—weigh against a likelihood-of-confusion finding.

As for the sixth digit, the district court's determination that the infringement was "willful"—because Defendants were aware of TBC before they began selling golf carts and continued using the Trojan-EV mark after receiving TBC's cease-and-desist letter and being sued—is contrary to Fifth Circuit law and clearly erroneous. Mere awareness of the plaintiff or its mark is not evidence that the defendant adopted a mark with an intent to confuse or deceive. And this Court follows the majority rule amongst jurisdictions, that a defendant's continued use of a mark even after it receives a cease-and-desist letter cannot be construed as evidence of intent to confuse.

As for the seventh digit, the determination that there was "actual confusion" also is contrary to Fifth Circuit law and clearly erroneous. Fifth Circuit precedent instructs that isolated instances of actual confusion—even assuming that's what all five cited instances show—are insufficient to sustain a finding of likelihood of confusion. The district court's finding that there is a likelihood of confusion is thus clearly erroneous and should be set aside.

Even if the liability finding is upheld, the award of disgorged profits from Defendants still should be vacated. The district court abused its discretion in awarding TBC disgorged profits for two independent reasons. First, the court erred in concluding that disgorgement is equitable under the factors enumerated in *Pebble Beach Co. v. Tour 18 I Ltd.* The disgorgement award is based on the court's findings and conclusions about the first *Pebble Beach* factor: that the infringement was "willful." Because there was no "willful" infringement, the disgorgement award cannot stand.

And as to the second *Pebble Beach* factor, the court's findings and conclusions confirm that no sales were lost or diverted. TBC thus can only speculate as to harm, and under these circumstances—with no lost or diverted sales and because there was no palming off—TBC faces an uphill battle in obtaining disgorgement.

11

Second, the disgorgement award constitutes an abuse of discretion also because the district court misallocated the attribution burden under section 1117(a). This Court's decisions, including *Texas Pig Stands*, confirm that disgorgement is not automatic and must be limited to profits caused by the infringement. Mere proof of infringing sales creates only a limited, rebuttable inference that profits are attributable to infringement—not a wholesale shift of the causation burden to defendants. Because TBC offered no attribution evidence, and Defendants proved sales were driven by non-mark factors, the disgorged-profits award must be vacated.

Finally, even if the liability finding is upheld, the district court's permanent injunction still should be modified. The permanent injunction is overbroad because it is not limited to golf carts, the golf industry, or even products in which TBC's batteries are used. The permanent injunction's scope exceeds the findings of infringement on TBC's rights.

## STANDARDS OF REVIEW

**A.    Findings of fact are reviewed for clear error, and conclusions of law are reviewed de novo.**

In Sections I, II, and III, Defendants challenge the district court's findings of fact and conclusions of law. A district court's findings of fact are reviewed for clear error and its legal conclusions are reviewed de novo. *E.g.*, *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 537 (5th Cir. 1998), *abrogated on other grounds by TrafFixDevices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23 (2001). A finding of fact is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496, 501 (5th Cir. 1979).

**B.    The district court's award of disgorged profits is reviewed for an abuse of discretion.**

In Sections II and III, Defendants challenge the award of disgorged profits to TBC. An award of disgorged profits under 15 U.S.C. § 1117(a) is reviewed for an abuse of discretion. *E.g.*, *Pebble Beach*, 155 F.3d at 554. A district court abuses its discretion when it (1) relies on clearly erroneous factual findings; (2) relies on erroneous conclusions of law; or (3) misapplies the law to the facts. *E.g.*, *Peaches Ent. Corp. v. Ent. Repertoire Assocs., Inc.*, 62 F.3d 690, 693 (5th Cir. 1995).

Defendants raised their third issue in their amended Rule 52(b) motion. ROA.4293-4360. To the extent that it is necessary to prevail, Defendants also challenge the denial of their amended Rule 52(b) motion, which is reviewed for an abuse of discretion. *E.g.*, *Thamathitikhun v. Bank of Am., N.A.*, 705 F. App'x 215, 218 (5th Cir. 2017). Defendants showed that there were manifest errors of law or fact in the district court's findings and conclusions, *e.g.*, *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1219 (5th Cir. 1986), so the denial of that motion was an abuse of discretion.

**C.    The district court's grant of a permanent injunction is reviewed for an abuse of discretion.**

In Section IV, Defendants challenge the district court's permanent injunction. A grant of a permanent injunction is reviewed for an abuse of discretion. *E.g.*, *Peaches Ent.*, 62 F.3d at 693. A district court abuses its discretion in entering a permanent injunction when it (1) relies on clearly erroneous factual findings when deciding to grant or deny the permanent injunction, (2) relies on erroneous conclusions of law when deciding to grant or deny the permanent injunction, or (3) misapplies the factual or legal conclusions when fashioning its injunctive relief. *Id.*

14

**ARGUMENT**

## I.     The district court erred in finding Defendants liable for trademark infringement and unfair competition.

The district court concluded that all eight "digits of confusion" "weigh uniformly in favor of a finding of a likelihood of confusion" and thus found Defendants liable for trademark infringement and unfair competition. ROA.3813-14 ¶¶133-37. As we explain, the court erred in analyzing and weighing the digits, and its finding that there is a likelihood of confusion is clearly erroneous. This Court should reverse and render judgment that TBC take nothing.

### A.     The district court's findings and conclusions are copied almost verbatim from TBC's proposed findings and conclusions.

To begin, the district court's findings and conclusions are copied almost verbatim from TBC's proposed findings and conclusions. Consider, for instance, those about Defendants' intent, including the court's adverse credibility determination. Apart from omitting some citations to the trial record, the court merely changed "paint a compelling picture" to "support the strong inference" in paragraph 107. *Compare* ROA.3474-77 ¶¶102-07, *with* ROA.3801-04 ¶¶102-07.

When, as here, the district court's findings of fact and conclusions of law are "copied almost verbatim from proposed Findings of Fact and Conclusions of Law submitted by plaintiff's counsel," this Court "can take into account the District

15

Court's lack of personal attention to factual findings in applying the clearly erroneous rule." *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 258 (5th Cir. 1980). This Court has said it "can feel slightly more confident in concluding that important evidence has been overlooked or inadequately considered when factual findings were not the product of personal analysis and determination by the trial judge." *Id.* (cleaned up).

A review of all the evidence should leave the Court with the definite and firm conviction that the district court was mistaken in finding, among other things, that there is a likelihood of confusion and—as to the sixth digit—that Nell's testimony was "not credible" and his purported "lack of truthfulness" was "strong evidence of intent to deceive and intent to trade on the TROJAN® name." *Id.*; *see* ROA.3801-04 ¶¶103-07.

## B. The district court's finding that there is a likelihood of confusion is clearly erroneous.

TBC brought its trademark-infringement and unfair-competition claims under both the Lanham Act and Texas common law. ROA.3765 ¶1. The elements of common-law trademark infringement under Texas law are the same as those under the Lanham Act. *E.g.*, *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 450 (5th Cir. 2017). To prevail on its trademark-infringement claims, TBC must show that (1) it possesses a legally protectable trademark, and (2) Defendants'

16

use of this trademark creates a likelihood of confusion as to the source, affiliation, or sponsorship of Trojan-EV-branded golf carts. *E.g.*, *id.*

"As a general rule, the same facts which would support an action for trademark infringement would also support an action for unfair competition." *Marathon Mfg. Co. v. Enerlite Prods. Corp.*, 767 F.2d 214, 217 (5th Cir. 1985). The gravamen of any action for trademark infringement or unfair competition is whether the challenged mark is likely to cause confusion. *Id.* With no likelihood of confusion, there can be no unfair competition. *Amstar*, 615 F.2d at 265.

"Likelihood of confusion is synonymous with a probability of confusion, which is more than a mere possibility of confusion." *Pebble Beach*, 155 F.3d at 543. To determine whether a likelihood of confusion exists, this Court considers the following (nonexhaustive) "digits of confusion": (1) the type of trademark; (2) mark similarity; (3) product similarity; (4) outlet and purchaser identity; (5) advertising media identity; (6) defendants' intent; (7) actual confusion; and (8) care exercised by potential purchasers. *E.g.*, *Rex Real Est. I, L.P. v. Rex Real Est. Exch., Inc.*, 80 F.4th 607, 620 (5th Cir. 2023). No digit is dispositive, and the digits may weigh differently from case to case. *Id.*

Likelihood of confusion is a question of fact. *Amstar*, 615 F.2d at 258. The district court's finding that there is a likelihood of confusion is clearly erroneous and thus should be set aside. *Id.*

### 1.    First Digit:  The type of trademark.

The district court found that "[t]he mark TROJAN is arbitrary for golf cart batteries because it does not describe or suggest any feature of Trojan Battery's products." ROA.3778 ¶41. The court also concluded that TBC's marks "are strong marks for golf cart batteries and in the golf industry and entitled to a wide scope of protection, and therefore this factor weighs in favor of a likelihood of confusion." ROA.3790 ¶66. That was error.

The first digit—type of trademark—refers to the senior mark's strength. *Rex*, 80 F.4th at 621. This Court analyzes two factors in determining strength: (1) the mark's position along the distinctiveness spectrum, and (2) the mark's standing in the marketplace. *Id.*

The first factor refers to the five categories of increasing distinctiveness that marks generally fall into. *Id.* TBC's marks for "Trojan" are suggestive. "A suggestive term is one which suggests rather than describes, some particular characteristic of the goods or services to which it applies and requires the consumer to exercise the imagination in order to draw a conclusion as to the nature of goods

18

and services. . . An oft-cited example . . . is 'Penguin' as applied to refrigerators." *Union Nat'l Bank of Tex., Laredo, Tex. v. Union Nat'l Bank of Tex., Austin, Tex.*, 909 F.2d 839, 845 (5th Cir. 1990) (cleaned up).

In determining where a mark falls along the spectrum, "[a] starting place is the dictionary definition." *Id.* at 847. Defendants asked the district court to take judicial notice[2] of the dictionary definition of "trojan," which suggests a particular characteristic of the goods and services to which it applies: "2: one who shows qualities (as pluck, endurance, or determined energy) attributed to the defenders of ancient Troy[.]" Merriam-Webster's Collegiate Dictionary 1265 (10th ed. 1998). While the consumer is required to exercise the imagination, "endurance" or "determined energy" are characteristics of battery performance.

Notably, this dictionary definition is consistent with the testimony of TBC's corporate representative (Pigott), who agreed that "Trojan" describes or suggests qualities such as "endurance" and "performance." ROA.5645. "Trojan" is thus not arbitrary as applied to batteries.

As for the second factor, Fifth Circuit law instructs that a mark's standing is impacted by third-party usage—even for unrelated goods and services—and,

---

[2] ROA.5645; ROA.3656-57. The court held that issue in abeyance pending review of the parties' proposed findings and conclusions. ROA.5648-49.

separately, third-party registrations. *See Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*, 982 F.3d 280, 294 (5th Cir. 2020) ("we do not confine our analysis of third-party usage to products of the exact type that the plaintiff sells"); *Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 315-16 (5th Cir. 1981) (rejecting the argument that unrelated third-party uses were irrelevant); *Amstar*, 615 F.2d at 259-60 (considering evidence of 72 third-party registrations and 15 third-party uses of the mark "Domino"). A district court thus errs when, as here, it fails to properly weigh the impact of third-party usage and registrations.

Defendants presented undisputed evidence of actual uses of two famous marks containing the word "Trojan": as an identifier of a brand of condoms and the USC sports teams. TBC's witnesses, of course, knew of Trojan condoms and the USC Trojans, as did Nell. ROA.5649-50, 5781, 5948, 6065; *see also* ROA.6443, 6450. TBC's senior marketing communications manager, Sarah Brennand, also volunteered that her "high school mascot was the Trojans." ROA.5781. TBC's corporate representative (Pigott) agreed that dealers and potential golf-cart purchasers "anywhere would know the USC Trojans." ROA.5686. The widespread knowledge of the uses of these two famous marks sensitizes everyone, including those in the golf world, and lessens the strength of TBC's marks. *See Future Proof*, 982 F.3d at 294 (third-party usage tended to show mark was weak);

*Springboards to Educ., Inc. v. Hous. Indep. Sch. Dist.*, 912 F.3d 805, 815 (5th Cir. 2019) (six examples constituted "widespread third-party use"); *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 170 (5th Cir. 1986) (mark's common use diluted its strength).

Defendants also presented evidence of 29 third-party registrations including "Trojan." ROA.6469-6533. They included registrations owned by USC, a boat company, and a tire company. ROA.5682-86; ROA.6500 (mark was registered for 55 years until its cancellation); ROA.6506, 6508; ROA.6512, 6520, 6527, 6529 (marks still live). Golf carts use tires. And TBC sells branded batteries into the marine market. ROA.5683.

And counsel's response to TBC's cease-and-desist letter specified that, based on her search, "[a]cross all classes there are over 100 active records using the word 'trojan.'" ROA.6468. Counsel thus asserted, "the mark is inherently weak considering the 111 active records utilizing this word."[3] ROA.6467.

But the district court discounted these third-party uses and registrations as either "far afield from golf carts and golf cart batteries" (ROA.3787-88 ¶60) or "expired," "cancelled," or "abandoned." ROA.3789 ¶64. It wrote, "two uses of

---

[3] The district court admitted this exhibit, not for the truth of the matters asserted, but to show the response to TBC's letter. ROA.6135-36.

Trojan in unrelated markets falls far short of the "extensive" use required to weaken a mark, given the strong evidence of commercial strength for the TROJAN® brand in the golf cart industry." ROA.3788 ¶60. And as to Defendants' evidence of third-party registrations, it said "[t]here was no evidence that any of these marks are in use, and no evidence that any of the marks are used in the same field as the parties here—the golf cart market" and thus "they do not supply any evidence that the marks have had 'any effect on mind of the purchasing public.'" ROA.3788 ¶61. That was error.

Defendants' evidence of third-party uses and registrations was entitled to much greater weight than was accorded here. *See El Chico, Inc. v. El Chico Cafe*, 214 F.2d 721, 725 (5th Cir. 1954) (plaintiff did not claim to be originator of "El Chico" as a trademark and defendants' evidence showed 27 similar trademark registrations). Abandoned and expired registrations *are* relevant, *Amstar*, 615 F.2d at 259-60, and the registrations were admissible for the truth of the matters asserted therein, including stated dates of first uses. *See Sun Banks*, 651 F.2d at 316 (considering third-party uses in the form of registrations); *see also* Fed. R. Evid. 803(8, 14, 15), 807; *Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 504 (7th Cir. 1992) (registration creates "a rebuttable presumption of use as of the filing date"). The third-party uses and

registrations documented here limit the protection to be accorded TBC's marks outside the uses to which TBC has already put them. *Amstar*, 615 F.2d at 260.

Even if its application to batteries were arbitrary, "Trojan" "is still not to be accorded the same degree of protection given . . . coined and fanciful terms." *Id.* The categorization of TBC's marks "alone . . . does not precipitate absolute protection." *Sun Banks*, 651 F.2d at 315.

### 2.    *Second Digit:  Mark similarity.*

The district court concluded that "the parties' respective marks are highly similar" and "this factor weighs in favor of a likelihood of confusion." ROA.3792 ¶75. It concluded that "Trojan is the dominant word in both party's marks" and "the most important feature for the likelihood of confusion analysis." ROA.3790-91 ¶¶71-72. It also concluded that "[t]he appearance of the parties' logos further supports a likelihood of confusion" because both use "Greek imagery that reinforces the common word TROJAN." ROA.3791 ¶73. And last, it concluded that "the parties' marks sound highly similar." ROA.3792 ¶74. That, too, was error.

The second digit—degree of similarity—is determined by comparing the marks' appearance, sound, and meaning. *E.g.*, *Rex*, 80 F.4th at 621-22. "Similarity of appearance is determined on the basis of the total effect of the designation, rather than on a comparison of individual features," *Amstar*, 615 F.2d at 260-61, but

"courts should give more attention to the dominant features of a mark." *Rex*, 80 F.4th at 622.  The comparison of the marks must be done in their actual marketplace context as consumers would have seen them.  *Future Proof*, 982 F.3d at 295; *Armstrong*, 597 F.2d at 502-04.

We do not quarrel with the district court's conclusion that "Trojan is the dominant word" in the parties' marks, but that is not the end of the analysis.  This Court must "consider the commercial impression created by the mark as a whole." *Amstar*, 615 F.2d at 261.  "It is the overall impression that counts." *Armstrong*, 597 F.2d at 502.

Considering the total effect of the parties' marks, there is little similarity between them.  To start, the parties do not use identical word marks with unconventional spelling, making this case unlike *Viacom Int'l v. IJR Cap. Invs., L.L.C.*, 891 F.3d 178, 193 (5th Cir. 2018) ("The Krusty Krab").  Although TBC has a registration for the word "Trojan" standing alone, TBC does not make stand-alone trademark use of that word, which would be inconsistent with its own Branding Guidelines.  ROA.5665-66; *see* ROA.6752-73.  None of TBC's branded batteries features the word "Trojan" alone.  ROA.5673.  The only mark TBC uses on its branded batteries is its logo, consisting of a solid winged horse and the words

"Trojan Battery Company." ROA.6664; *see, e.g.*, ROA.6803. The district court's findings to the contrary are clearly erroneous. ROA.3732 ¶¶14-15.

Nor did TBC offer any evidence of using the word "Trojan" alone on displays associated with its batteries before this lawsuit was filed. On that score, TBC's exhibits depicted in the court's findings and conclusions show that TBC always uses all or part of its logo on its displays and other materials, *in addition to* the word "Trojan." ROA.3737 ¶36; ROA.3740 ¶48; ROA.3742-45 ¶¶53-56; ROA.3747-49 ¶¶57-58. The word "Trojan" never appears without at least the winged-horse part of TBC's logo.

Similarly, the accused products are not labeled with the word "Trojan" alone, but rather with the Trojan-EV logo consisting of a side view of a warrior Spartan helmet, facing towards the right, with the wording "TROJAN-EV" to the right of the helmet. ROA.3754-56 ¶¶82, 84-85; ROA.3759-60 ¶101. The wording "TROJAN-EV" is underlined with a spear.

Further contrary to the district court's conclusions, the parties' logos are visually distinct because they use different fonts and design elements. TBC's logo uses a dominant winged horse, while the Trojan-EV logo uses a dominant Spartan helmet and a spear:



ROA.6664.



ROA.6460.

The logos are not in a similar configuration, and are stylistically and typographically distinguishable. The distinct font is italicized in the Trojan-EV logo but not TBC's.

What's more, TBC's "brand identity" is "the winged Pegasus horse and the maroon color on both its batteries and marketing," which "identify [TBC's] batteries as TROJAN® batteries." ROA.3791 ¶73. Apart from its logo, TBC uses "a Modern Maroon charging Pegasus with lightning bolt features" as follows:



ROA.6756.

TBC's "Brand" also includes the phrase "Trojan Battery Company"—not just the word "Trojan" alone—arranged in a "precise lockup" as follows:



ROA.6757.

TBC's preferred expression of its "Brand" is "a precise alignment of [its] Brand Symbol and [its] Brand Signature" as follows:



ROA.6758.

Other than coloring, TBC's "Primary Logo" (*Id.*) is nearly identical to its asserted (and registered) logo mark. ROA.6664.

Also, TBC's branded batteries are labeled "MOTIVE" except for its lithium-ion batteries which are labeled "LITHIUM-ION." *See, e.g.*, ROA.6803, 6809. Those words are in a larger font than any other word, including "Trojan."

In contrast, Trojan EV never used any horse—winged or not—on any Trojan-EV-branded golf carts or in its marketing materials. ROA.6103. Its marketing materials are readily distinguishable from TBC's, using vastly different colors, fonts, and design elements. ROA.3747-48 ¶57. And not a single Trojan-EV-branded golf cart was maroon-colored (let alone sold with a maroon battery). ROA.6101, 6068, 6069. No Trojan-EV-branded golf cart was labeled with "MOTIVE" or "LITHIUM-ION." ROA.5668-69.

And while "[s]imilarity of sound . . . *may* be taken into account," this Court has said aural similarity must not be placed on a pedestal. *Future Proof*, 982 F.3d at 296. Neither golf carts nor batteries are purchased "by verbal request"; the parties' products are sold at retail locations, so aural similarity is of minimal significance. *Id.* In any event, Trojan EV never used the word "Trojan" alone on its golf carts or in its marketing materials; it always used the hyphenated "-EV," adding two syllables

so the names are not identical. They look and sound different. The overall impression conveyed by Defendants' use of "Trojan-EV" is substantially different from that created by TBC's use of "Trojan Battery Company" or "Trojan Battery Sales." *See Amstar*, 615 F.2d at 261.

Finally, the Patent and Trademark Office (PTO) made an initial determination that Trojan EV was entitled to register its marks—showing that they were not confusingly similar to any registered mark. *Id.*; ROA.6451-60. At the time of the determination, TBC had registered "Trojan" for batteries and "Trojan Battery Sales" for retail and wholesale store services and distributorships featuring various types of batteries. ROA.6661-65.

### 3.     *Third Digit: Product similarity.*

The district court concluded that the parties' products are "highly related" and "this factor weighs heavily in favor of a likelihood of confusion." ROA.3796 ¶86. The court specified two reasons: (1) a company called "Star EV" uses "the same brand to sell golf carts and golf cart batteries"; and (2) the products are "highly complementary." ROA.3794 ¶¶81-82. That was error.

The parties' products are noncompeting. "When products or services are noncompeting, the confusion at issue is one of sponsorship, affiliation, or connection." *Rex*, 80 F.4th at 622. "The danger of affiliation or sponsorship

confusion increases when the junior user's services are in a market that is one into which the senior user would naturally expand." *Id.* But the senior user's actual intent to expand is not particularly probative. *Id.* "If consumers believe, even though falsely, that the natural tendency of producers of the type of goods marketed by the prior user is to expand into the market for the type of goods marketed by the subsequent user, confusion may be likely." *Id.*

Here, neither reason supports the court's conclusion that the products are "highly related." First, no evidence supports a finding that the golf-cart market is one into which golf-cart-battery manufacturers would naturally expand. The court said "consumers are likely to think that both sorts of products are sold by the same company" based on "one specific company called Star EV." ROA.3794 ¶81. But TBC presented no evidence about "Star EV"—including whether it is a national or regional company or the volume of its sales. When asked "[h]ow big of a company is Star EV," Brennand confessed, "I don't know." ROA.5793.

In contrast, the "big three" golf cart manufacturers—Yamaha, Club Car, and E-Z-GO—do not use the same brand to sell golf carts and batteries. ROA.3795 ¶83. The natural tendency of golf-cart-battery manufacturers is thus *not* to expand into the golf-cart market—making confusion unlikely. Indeed, TBC commands a "dominant" market position (ROA.3784 ¶52) and—despite being in business for

100 years—TBC has never made or sold golf carts and has no plans to do so in the future.  ROA.5579, 5638-39.  More still, TBC's corporate representative (Pigott) could not specify the companies he "believe[s]" sell golf carts and batteries under the same brand, besides "Star EV."  ROA.5580.

Second, the court cited *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591 (5th Cir. 1985), to support its conclusion that the products are "highly complementary."  *Fuji* explains that "[c]omplementary products have been held particularly susceptible to confusion," "especially . . . when . . . the senior user is diversified."  754 F.2d at 598.  But TBC is not and never has been diversified.  Neither were Defendants.  So, *Fuji* is inapt.

Moreover, the parties' respective lines of business are not "complementary" within *Fuji*'s formulation.  754 F.2d at 598.  TBC contended that golf carts would be useless without a battery, but TBC's batteries are used in many other applications (e.g., aerial work platforms, floor care, solar, material handling, pallet jacks, forklifts).  ROA.5927.  TBC's batteries are thus far from useless without golf carts.  As Sanders agreed, "[j]ust because a battery made by Trojan Battery Company is a 'golf cart battery' that doesn't mean it is used only in golf."  ROA.5952.

31

### 4.    Sixth Digit: Defendants' intent.

The district court concluded "that Defendants intended to trade on the goodwill buil[t] up in [TBC's] TROJAN® brand" and "this factor weighs in favor of a finding of likelihood of confusion." ROA.3805 ¶111. It also concluded that Defendants' purported infringement was "willful," that certain of Nell's testimony was "not credible," and that "this lack of truthfulness [was] strong evidence of intent to deceive and intent to trade on the TROJAN® name." ROA.3801-05 ¶¶102-10. That was error.

The sixth digit—Defendants' intent—focuses on whether the defendant intended to derive benefits from the plaintiff's reputation. *E.g.*, *Future Proof*, 982 F.3d 296. When, as here, there is no evidence of an intent to confuse, mislead, or deceive the public, this digit can weigh against a likelihood-of-confusion finding. *Streamline*, 851 F.3d at 456-57.

The district court made several findings and conclusions about Defendants' purported intent, including in its disgorgement analysis. All are contrary to Fifth Circuit law and are clearly erroneous.

*First*, it concluded that Defendants "intended to trade on the goodwill of the TROJAN® brand," because they "knew of the TROJAN® brand before they began selling golf carts" and "were well aware of the close connection between TROJAN®

batteries and electric golf carts." ROA.3801 ¶102. But mere awareness of the plaintiff or its mark is not evidence that the defendant adopted a mark with an intent to confuse or deceive. *See Future Proof*, 982 F.3d 296; *Streamline*, 851 F.3d at 456; *Amstar*, 615 F.2d at 263 & n. 9. Nor is it evidence of bad faith. "Bad faith in the adoption and use of a trademark normally involves the imitation of packaging material, use of identical code numbers, adopting of similar distribution methods or other efforts by a party to 'pass off' its product as that of another." *Amstar*, 615 F.2d at 263.

There is no evidence that Defendants attempted to pass off Trojan-EV-branded golf carts as affiliated with TBC. TBC has never contended otherwise, which is unsurprising given the facts.

*Second*, the court concluded that the purported infringement was "willful," also because Defendants "knew of the TROJAN® brand before they began selling golf carts" and "were well aware of the close connection between TROJAN® batteries and electric golf carts." ROA.3801 ¶102. Again, mere awareness of the plaintiff or its mark is not evidence that the defendant had an intent to deceive, so this finding cannot support a conclusion that the infringement was "willful."

The court also said "willful" infringement was shown because "Defendants continued to infringe, and indeed developed an entirely new infringing golf cart ***after***

receiving a cease and desist letter and ***after*** being sued." ROA.3804 ¶108; *see also* ROA.3817 ¶148. In the court's view, this was "strong evidence of intent to deceive." ROA.3805 ¶110. But the court did not make the necessary findings that Defendants or Nell had a subjective belief that they were guilty of trademark infringement, and its findings that they acted with an intent to deceive are clearly erroneous. The court thus abused its discretion in finding that any infringement was "willful."

"Trademark infringement is willful if it is done voluntarily and intentionally and with the specific intent to cause the likelihood of consumer confusion and with the intent to cause confusion, to cause mistake, or to deceive." *Appliance Liquidation Outlet, L.L.C. v. Axis Supply Corp.*, 105 F.4th 362, 384-85 (5th Cir. 2024) (cleaned up). "The infringer must have a subjective belief that it was, in fact, guilty of trademark infringement." *Id*. at 385 (cleaned up). Absent some other evidence of wrongdoing, however, the mere fact that the defendant continued using the challenged mark after the plaintiff made it aware of its mark and filed suit against it does not support a conclusion that the defendant had a subjective belief that it was, in fact, guilty of trademark infringement. *Id*. That's because the defendant "may have considered that plaintiff's contention was without a legally supportable basis and made a rational business decision to continue use until a court stated otherwise."

*Streamline*, 851 F.3d at 456.

The court made no finding that Defendants or Nell had a subjective belief that they were guilty of trademark infringement. It did find they acted with an "intent to deceive" because they continued using the Trojan-EV mark after receiving TBC's cease-and-desist letter and being sued (ROA.3805 ¶110), but *Axis Supply* requires more. 105 F.4th at 385. So the mere fact that Defendants and Nell continued using the Trojan-EV mark is not evidence of an intent to deceive.

What's more, other evidence shows that Nell had no intent to confuse or deceive after receiving TBC's cease-and-desist letter. Nell engaged counsel and relied on both counsel's detailed response, which he reviewed (ROA.6135), and the PTO's Notices of Publication. The response did not merely deny likelihood of confusion, but explained why counsel came to that conclusion. ROA.6466-68.

And the Trademark Examiner reported in November 2021 that the federal trademark applications for the Trojan-EV mark and logo had passed substantive review. ROA.6451-60; ROA.6203. Nell testified that based on the Notices of Publication, "I considered that I had the right under Trojan-EV to use the Trojan-EV name" on golf carts. ROA.6140-41.

There is no evidence that Defendants modified their conduct or Nell modified the Trojan-EV mark after learning of TBC's marks in an attempt to trade on TBC's

goodwill.  *Streamline*, 851 F.3d at 463.  Defendants never "attempt[ed] to profit from [TBC's] mark."  *Tex. Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc.*, 951 F.2d 684, 695 (5th Cir. 1992) (*Tex. Pig Stands I*), *panel and en banc reh'g denied with opinion*, 966 F.2d 956 (5th Cir. 1992) (*Tex. Pig Stands II*).

<u>*Third*</u>, the court made an adverse credibility determination; it concluded that "Nell's testimony that he did not know about TROJAN® batteries or Trojan Battery Company when he adopted the Trojan-EV name is not credible."  ROA.3801 ¶103. The court found the perceived "lack of truthfulness to be strong evidence of intent to deceive and intent to trade on the TROJAN® name."  ROA.3804 ¶107.  But the adverse credibility determination is based on a clearly erroneous factual finding and thus is clearly erroneous.

When an adverse credibility determination is based on a clearly erroneous factual finding, it will not be upheld.  *See, e.g.*, *Sun Banks*, 651 F.2d at 319 ("We recognize that great deference is due a credibility call by a trial judge.  After several readings of the pertinent testimony, however, we remain unconvinced that the evidence supports the finding that the remark was made." (internal citations omitted)).  The Supreme Court has explained how to apply a clear-error standard to a district court's credibility findings.  In *Anderson v. City of Bessemer City*, the Supreme Court cautioned that findings cannot be "insulate[d] . . . from review by

denominating them credibility determinations" and outlined certain "factors" for consideration. 470 U.S. 564, 575 (1985). When such factors are present—including whether the testimony is supported or contradicted by documents or objective evidence—a court "may well find clear error even in a finding purportedly based on a credibility determination." *Id.*; *see In re Luhr Bros., Inc.*, 157 F.3d 333, 339-43 (5th Cir. 1998) (applying *Anderson* in concluding that findings based on credibility determinations were clearly erroneous).

Nell testified that he first learned TBC existed on November 19, 2020, when a Continental salesman visited GCC and followed up with an email to Fuentes, who then worked for GCC.[4] ROA.6131-32. Nell also testified that he first learned of TBC's trademarks through its cease-and-desist letter. ROA.6132. No evidence contradicts Nell's testimony.

Still, the court determined that Nell's testimony was not credible based on documentary evidence—Fuentes' email responding to the Continental salesman's email—as well as circumstantial evidence. ROA.3801-04 ¶¶103-07. At bottom, the court's adverse credibility determination is based on a clearly erroneous factual finding—that Nell was aware of TBC when he adopted the Trojan-EV name in

---

[4] After the visit, Continental never notified TBC of any possible infringement—despite being contractually obligated to do so as a TBC distributor. ROA.5724-27.

October 2020. But none of the cited evidence supports such a finding. So, both that finding and the adverse credibility determination are clearly erroneous.

To start, Fuentes' email responding to the Continental salesman's November 19 email (ROA.6655) is not evidence that Nell (or Fuentes) was aware of TBC before that date. Nothing in Fuentes' November 20 email shows that he or Nell was aware of TBC before the Continental salesman's visit. Fuentes was merely trying to negotiate for a lower price: "Can you do 90 for the trojans and 25 on the cores?" *Id.* At best, Fuentes' response shows he had "familiar[ized]" himself "with TROJAN® batteries" between the time of the Continental salesman's visit and the time Fuentes sent his response a full day later. ROA.3803 ¶105.

The court also found it "highly unlikely . . . Nell was unaware of TROJAN® batteries" before November 2020. ROA.3802 ¶103. The court noted he began selling golf carts in February 2019 and organized GCC in August 2019 to sell used golf carts. *Id.* The court also pointed to GCC's website to support its credibility determination, in three respects. <u>One</u>, it noted GCC "had a service department that it touted on its website as having 'certified technicians' who could perform 'routine services' such as 'replacement batteries.'" *Id.* Because of "the dominant market share of TROJAN® batteries," the court inferred that Nell must have been aware of TBC before November 2020. *Id.*

But even if TBC had a "dominant market share," that does not mean Nell must have known about TBC before November 2020. Brennand herself admitted that she did not learn of TBC until TBC recruited her. ROA.5781. And TBC's corporate representative admitted that he was aware of Trojan condoms and the USC Trojans before he first heard of TBC. ROA.5649-50.

Defendants grew out of a garage business; Nell had no background in golf-cart sales beforehand. ROA.6119-20; *see* ROA.5689 (distinguishing garage dealers and established dealers). Nell's background is in construction, not golf carts. ROA.6065-66. And Nell testified that GCC's wholesaler had delivered the golf carts with preinstalled batteries under the brand name PD-Plus. ROA.6133. Nell also testified that when he started doing the customization himself, he had been aware of Interstate Batteries "because they're everywhere," so he selected Interstate Batteries without doing any comparison shopping. *Id.*; ROA.6203.

And when asked whether "during the time that [GCC] did customizations and service, your technicians replaced batteries in golf carts that came into your store?," Nell answered, "No," explaining that "the golf carts would have been either preordered with new batteries. When we started doing our own golf carts, then we would have swapped out the batteries before we sold them. Our focus has always been on sales, not service." ROA.5993.

Two, the court said Nell's testimony was "undermine[d]" by the presence on GCC's website of a stock photograph showing maroon batteries. ROA.3803 ¶106. But Nell is colorblind and thus cannot see the color maroon, as the court also found. *Id.*; ROA.5994. And there is no evidence Nell knew that TBC's batteries are maroon and thus the stock photograph shows "TROJAN® batteries." The photograph itself does not show any branding of the batteries. ROA.7719. Another photograph depicts Duracell batteries as the replacement. *Id.* In any case, Nell cannot distinguish maroon because he is colorblind. And Nell testified that the photograph was a stock photograph used by the website designer, not a photograph of a golf cart at GCC. ROA.5994.

Three, the court said GCC "had in fact promoted golf carts containing TROJAN® batteries on its website before it ever sold Trojan-EV golf carts." ROA.3804 ¶107. But those listings (ROA.7842-48) were posted in December 2020 and January 2021, respectively. ROA.6007-10, 6068-69. Nell also explained that he "didn't do the listing on the website." ROA.6008-09. The listings are no evidence Nell knew about TBC before November 2020.

*Fourth*, the court concluded that Defendants had "knowledge" of "actual confusion" based on emails received through the "Become a Dealer" link on Trojan EV's website. ROA.3804-05 ¶109; ROA.3809 ¶¶120-21. In the court's view,

"Defendants' continued sales despite their knowledge of consumer confusion with [TBC's] nearly identical marks is indicative of an improper motive." ROA.3817 ¶¶148-49. Even if all four emails were evidence of actual confusion (they aren't), the court's analysis is flawed.

The court relied on the fact that Nell "had *access to* the info@trojanev.com email address at which the emails were received" to conclude that he had "*knowledge of* the actual confusion." ROA.3814 ¶136 (emphasis added). From this, the court "imputed" Nell's "knowledge of the actual confusion" to GCC. *Id*. But there is no factual or legal basis to impute knowledge of the contents of those emails to Nell and on to Trojan EV or GCC, when the emails were read by a *non-management* employee of Trojan EV.

TBC failed to show that Nell had knowledge of the emails' content. Nell agreed that "[t]echnically" he had access to the email address "if [he] want[ed] it," but TBC never asked whether he had actually seen those few emails in the normal course of business. ROA.6028-29. TBC was aware that Shelley Tavarez—a Trojan EV sales employee (not an officer or executive)—was the person who accessed the emails. *Id*. TBC presented no evidence that Nell saw any of the few emails on which the court relied as evidence of "actual confusion."

The court also cited *United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 848 F.3d 366 (5th Cir. 2017), for common-law imputation principles, but *Vavra* supports our arguments. *Vavra* instructs that "[k]nowledge of a mere employee of the corporation ordinarily is not imputed to the company." *Id.* at 374. This Court rejected as clearly erroneous the finding that James Bennett's limited authority was sufficient to impute his knowledge of receiving kickbacks to his employer-corporation. *Id.* at 375-76. Here, Tavarez's knowledge of the words in emails likewise cannot be imputed to Trojan EV or Nell (let alone GCC) because she was a mere Trojan EV sales employee.

*Finally*, the court said "[t]he only reasonable conclusion to draw is that Defendants believed that the Trojan-EV name had significant value and would generate significant profits over another brand without the name recognition of TROJAN® in the golf cart space." ROA.3818 ¶151. But that ignores the record.

For one, in addition to the "Trojan-EV" brand, Nell developed two other brands: "EV Titan" and "Spartan-EV." ROA.3751 ¶75. All three brands are related thematically. ROA.6077. The "Trojan-EV" brand was developed second-in-time.

Nell thus did not rely on the "Trojan" name (let alone TBC's marks) to generate sales. All three of Nell's brands offer features not found in Club Car,

Yamaha, or E-Z-GO golf carts—they are rated by the National Highway Traffic Safety Administration to be an LSV (low-speed vehicle) able to be driven on streets, with a 17-digit VIN and title, and have safety features including speedometers, turn signals, brake lights, seatbelts, and DOT windshields and tires.  ROA.5995-97, 6069-70, 6120-23.  As Nell testified, customers consider safety features to be the most important thing about a golf cart.  ROA.5957, 6155.

For another, Defendants "considered that [TBC's] contention was without a legally supportable basis and made a rational business decision to continue use until a court stated otherwise."  *Streamline*, 851 F.3d at 456.  Trojan EV's decision was rational; it had a continuing interest in using the Trojan-EV mark when it learned in December 2021 that its supplier would not honor future orders for the model A Trojan-EV golf carts.  Trojan EV had paid for and continued to receive shipments of model A carts for the next 18 months.  It received the last shipment in May 2023.  ROA.6149-52.  And Defendants ceased selling and marketing Trojan-EV-branded golf carts as soon as they received the district court's decision.  ROA.3855.

### 5.    *Seventh Digit:  Actual confusion.*

The district court concluded that there was "evidence of actual confusion," which "weighs heavily in favor of a finding of likely confusion."  ROA.3810-11 ¶124. The court based that conclusion on five anecdotal instances of alleged confusion—

one involving Bill Malloy, a custom golf-cart dealer, and four involving emails received by Trojan EV through the "Become a Dealer" link on its website. ROA.3807-09 ¶¶116-21. That was error.

"Actual confusion need not be proven, but it is the best evidence of a likelihood of confusion." *Rex*, 80 F.4th at 623 (cleaned up). A plaintiff may show actual confusion using anecdotal instances of consumer confusion, systematic consumer surveys, or both. *Id.* A plaintiff alleging infringement must show that the defendant's use of marks, not some other source, caused a likelihood of confusion. *Id.*

TBC chose not to offer survey evidence. Instead, it relied on anecdotal instances of alleged confusion. First, TBC offered evidence involving Malloy, who also is a long-time TBC dealer. The court concluded that Malloy's email to Sanders shows actual confusion. ROA.3807 ¶116. But the context and timing of events surrounding that email makes clear it is no evidence of actual confusion.

Malloy is a custom golf-cart dealer and long-time TBC dealer. ROA.3337-39. He first became aware of Trojan EV in July 2021 when he was searching the internet for available golf carts and golf-cart dealers (not batteries). ROA.3333. Upon visiting the Trojan-EV website, Malloy immediately realized that Trojan EV and TBC were "very different companies." ROA.3334-35. He then clicked on the "Become a

Dealer" button. ROA.3334. Malloy later received an email from info@trojanev.com with a form to complete for consideration as an authorized dealer. ROA.3333-34, 7716-17.

Later that day, Malloy forwarded the email to Sanders, "making small talk" and joking about Trojan-EV golf carts being "ugly." ROA.3334, 7715-16. Already knowing that Trojan EV and TBC were "very different companies," Malloy was not confused when he emailed Sanders. ROA.3336-37. Several weeks later—despite his joke about Trojan-EV golf carts being "ugly"—Malloy responded to a follow-up email from info@trojanev.com with completed dealer paperwork. ROA.3335-36; ROA.6030-31; ROA.6834-55, 7191.

None of the evidence surrounding Malloy's experience shows that he was confused—not when he emailed Sanders and not even when he visited the Trojan-EV website. As a long-time TBC dealer, he quickly knew Trojan EV was not TBC.

Still, the court concluded that initial interest confusion existed because Malloy "filled out forms to become a Trojan-EV dealer." ROA.3808 ¶119. But Malloy completed the forms long after he knew Trojan EV and TBC were "very different companies" (and six weeks after joking Trojan-EV golf carts "were ugly"). ROA.6834-55. And the forms Malloy received from Trojan EV—including a price list for Trojan-EV golf carts—make no mention of TBC. *Id.*; ROA.7191. The more

reasonable inference is that Malloy, as a custom-golf-cart dealer, was interested in Trojan-EV custom golf carts. There is no evidence that Malloy somehow became confused after he visited the Trojan-EV website and knew Trojan EV and TBC were "very different companies."

Thus, the facts are very different than *Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d 188, 204 (5th Cir. 1998), where consumers were unable to realize there was no connection between the bar and Elvis until they physically entered the bar, sometimes after paying to enter.

Second, TBC offered evidence of four emails received by Trojan EV. But "isolated instances of actual confusion are insufficient to sustain a finding of likelihood of confusion." *Amstar*, 615 F.2d at 263. So, even including Malloy's experience and even assuming that all four emails show actual confusion (they don't), five instances of alleged confusion are insufficient to sustain a likelihood-of-confusion finding.

TBC failed to show that the emails were anything more than "short-lived impressions," *Armstrong*, 597 F.2d at 506, or "a fleeting mix-up of names." *Future Proof*, 982 F.3d 297. While "very little proof is required when customer purchases were actually swayed," "more is required when the confusion did not or cannot sway purchases." *Rex*, 80 F.4th at 625. "[I]solated instances of confusion about the

46

affiliation of two companies that do not result in redirected business are not enough."
*Id.*; *accord Rampart*, 2025 WL 586820, at \*5.

Of the four emails, two are dated 2021, one is dated 2022, and one is dated 2023. ROA.7177-79, 7839-40. The 2023 email makes no mention of TBC and asks for batteries TBC does not even sell. *See* page 53, *infra*. Only one email references "your batteries." ROA.7179. Regardless, 1,262 total emails were received. ROA.6124. The emails show, at most, isolated instances of confusion about the affiliation of two companies over 2½ years that resulted in no swayed purchases or redirected business.

Even if they did show confusion, these "isolated instances" are insufficient to sustain the likelihood-of-confusion finding here. *See Future Proof*, 982 F.3d 297 (at best, plaintiff showed a "fleeting mix-up of names"); *Armstrong*, 597 F.2d at 506 (evidence of "short-lived impressions" was insufficient); *Amstar*, 615 F.2d at 263 (same, as to evidence of two verbal inquiries and one misaddressed letter); *Sun Banks*, 651 F.2d at 319 (same, as to evidence of less than 15 incidents in three years).

### 6.    *Eighth Digit:  Care exercised by potential purchasers.*

The district court concluded that neither retail golf-cart dealers nor golf-cart purchasers "are sophisticated in a way that would help them avoid the likelihood of

confusion at issue here" and this digit "weighs in favor of a likelihood of confusion." ROA.3811-13 ¶¶127-30.  That was error.

For the final digit, the degree of care is determined by looking to both the kind of goods or services offered and the kind of purchasers. *E.g.*, *Rex*, 80 F.4th at 627. This Court has said "a person buying a 'big ticket' item . . . would ordinarily be expected to be a more careful buyer than the impulse purchaser or the purchaser of a relatively inexpensive item." *Armstrong*, 597 F.2d at 504 n. 10.

In *Oreck*, this Court overturned a jury verdict finding infringement in part because the ultimate purchasers of the defendant's products were "people who are directly responsible for . . . buying for professional and institutional purposes at a cost in the thousands of dollars" and "virtually certain to be informed, deliberative buyers." 803 F.2d at 173.  Like *Oreck*, here the parties' products are expensive. *Id.* at 171 (plaintiff's products were priced up to $1,500 retail, while defendant's were sold for $3,500 to $4,000 retail).

Golf cart batteries are expensive.  At the time of trial, a replacement set of TBC's batteries could cost "a little less than" $1,900 up to $2,200.  ROA.5722-24. Before trial, a replacement set could cost up to $3,600.  ROA.5724.  Notably, TBC's batteries are significantly more expensive than its competitors'.  ROA.3735-36 ¶¶27,

34. TBC "understand[s] that not every consumer can afford the up-front cost of a Trojan Battery." ROA.5528-29.

Trojan-EV-branded golf carts were even more expensive. New dealers bought an initial minimum, followed by an annual minimum. *E.g.*, ROA.7081 (Art. 7). And retail customers paid anywhere from $13,000 to $30,000 for new golf carts and $10,000 to $20,000 for used ones. ROA.5996, 6068; *see* ROA.6839.

These are not inexpensive or impulse items. Purchasers exercise substantial care before purchasing a golf cart. Purchasing a golf cart that costs upward of $30,000 "is not like pulling a box of dish soap off of a shelf at a retail store." *Streamline*, 851 F.3d at 458. For instance, Nell testified that prospective purchasers bought golf carts from GCC after learning of the different drive qualities, safety features, and comfort features, including by test driving multiple carts. ROA.6120-6123 (24:8-27:9). And purchasers looking for replacement batteries already own a golf cart.

And contrary to TBC's effort to label "consumers of TROJAN® batteries" unsophisticated (ROA.3485-87), the district court found—and TBC's witnesses emphasized—that TBC provides extensive education and training and literature about its batteries that is passed along to dealers. ROA.3735-36 ¶¶29-34; *see also* ROA.5484-85, 5522-24, 5534-36, 5641-42, 5756. TBC will not authorize any dealer

to sell its batteries—including those named in finding 108 (ROA.3764)—unless the dealer is properly "trained" and "know[s] the product." ROA.5531. TBC also has personnel who "spend much of the year on the road visiting face-to-face with retailers" to provide more education and training. ROA.3735 ¶32.

*Fuji* is thus inapt. Unlike *Fuji*, TBC's batteries are not "of negligible cost" when compared to Trojan-EV-branded golf carts; there is no evidence that the parties' products are purchased with a "lack of care"; and TBC's evidence of alleged confusion *is* disputed. 754 F.2d at 596, 598.

⁑

The district court committed clear error in concluding that all eight digits weigh in TBC's favor. At best, only the fourth and fifth digits—outlet, purchaser, and advertising media identity—do. But once the finding of mark similarity is rejected, those digits are "insignificant." *Armstrong*, 597 F.2d at 505.

The remaining digits—especially those having "special importance" (the sixth and seventh)—weigh against a likelihood-of-confusion finding. *See Future Proof*, 982 F.3d 298; *Sun Banks*, 651 F.2d at 319; *Amstar*, 615 F.2d at 264-65; *Armstrong*, 597 F.2d at 506.

## II.     The district court erred in awarding TBC disgorged profits from Defendants under 15 U.S.C. § 1117(a).

The district court also awarded TBC disgorged profits from Defendants under 15 U.S.C. § 1117(a).  ROA.3815-21.  As we explain, the court abused its discretion in making the award for two independent reasons.  So even if the liability finding is upheld, the disgorgement award still should be vacated.

### A.     The district court erred in concluding that disgorgement is equitable under the *Pebble Beach* factors.

The Lanham Act allows monetary recovery for certain violations in the form of actual damages, disgorgement, and costs.  15 U.S.C. § 1117(a).  Yet "[a] plaintiff's entitlement to disgorged profits is assessed based on the equities of the case and does not automatically follow from liability."  *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 919 F.3d 869, 875 (5th Cir. 2019).

Fifth Circuit law establishes two distinct considerations in assessing whether disgorgement is appropriate.  *Id*. at 875-76.  The first is whether disgorgement is equitable under the *Pebble Beach* factors.  *Id*. at 876.  The second is whether the defendant's profits are attributable to the Lanham Act violation.[5]  *Id*.

---

[5] We address this consideration in subsection B.

The district court abused its discretion in awarding TBC disgorged profits from Defendants because it erred in concluding that disgorgement is equitable under the *Pebble Beach* factors. The disgorgement award is based on the court's findings and conclusions about the first *Pebble Beach* factor: that the infringement was "willful." The court "conclude[d] that disgorgement of Defendants' profits is warranted here based on Defendants' willful infringement, the need to deter willful infringement in the future, [TBC's] swiftness in putting Defendants on notice and asserting its rights, and the interest in making willful infringement unprofitable." ROA.3819 ¶152.

For the above reasons on pages 32-43, the district court's findings and conclusions about Defendants' purported intent—including that their infringement was "willful"—are clearly erroneous. Because there was no "willful" infringement, the disgorgement award cannot stand. Indeed, while this Court has "declined to adopt a bright-line rule in which a showing of willful infringement is a prerequisite to an accounting of profits," such a showing is "an important factor." *Quick Techs., Inc. v. Sage Grp. PLC*, 313 F.3d 338, 349 (5th Cir. 2002) (cleaned up). This Court "regularly reverse[s] juries' profit-disgorgement awards for lack of evidence of willfulness." *Neutron Depot, L.L.C. v. Bankrate, Inc.*, 798 F. App'x 803, 807 (5th

Cir. 2020) (citing *Streamline*, 851 F.3d at 461-63; *Tex. Pig Stands I*, 951 F.2d at 694-96).

And as to the second *Pebble Beach* factor, the court's findings and conclusions confirm that no sales were lost or diverted. Instead, the court said "there is some evidence that [TBC] *may have* already lost sales or *be at risk of* having sales diverted." ROA.3818 ¶150 (emphasis added). The court based that conclusion on "[t]wo emails," but neither is evidence of lost or diverted sales.

The first email asked about batteries TBC does not even sell. ROA.7839 (requesting a quote for "12V 250-300Ah AGM or Lithium Batteries"); *see* ROA.6807 (showing that TBC's 12V AGM battery has a maximum rating of 135 Ah); ROA.6811 (showing that TBC's lithium-ion battery is a 48V battery, not 12V); ROA.5482 ("48-volt lithium ion"). The email was dismissed as spam because batteries were not listed on the Trojan-EV website and "this type of email gets sent regularly to every single company." ROA.6058.

The second email was looking for an *additional* source of TBC's batteries. ROA.7179. And because no sales were lost or diverted, TBC did not seek actual damages at trial.

TBC can only speculate as to harm—it failed to establish lost or diverted sales, and it is undisputed that this is not a case of palming off. "[A] plaintiff who cannot

demonstrate diversion or palming off faces an uphill battle in obtaining disgorgement." *Retractable*, 919 F.3d at 882.

## B.   The district court misallocated the burden of proving that any profits were attributable to the infringement.

The Lanham Act authorizes disgorgement only of "those profits attributable to the unlawful use." *Pebble Beach*, 155 F.3d at 554. The question here is who bears the burden on attribution—which profits are attributable to the infringement. The district court placed the burden solely on Defendants. But that result contradicts the statute's text and this Court's precedents. Even then, Defendants' evidence rebutted any inference that profits were caused by the use of TBC's marks, requiring denial or substantial reduction of disgorgement.

### 1.   Section 1117(a) and *Mishawaka* establish a limited, rebuttable inference—not a wholesale shift of the attribution burden to defendants.

The analysis starts with the statutory text. Section 1117(a) requires the plaintiff to prove infringing sales; it then shifts to the defendant the burden to prove "all elements of cost or deduction":

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office . . . shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, . . . subject to the principles of equity, to recover (1) defendant's profits . . . . In assessing profits the plaintiff shall be

> required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. . . . Such sum . . . shall constitute compensation and not a penalty. . . .

15 U.S.C. § 1117(a). The statutory text itself does not say which party bears the burden to prove attribution.

Below, TBC insisted that the Supreme Court had answered the question in its pre-Lanham Act decision in *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203 (1942). That decision confirms that the plaintiff "is not entitled to profits demonstrably not attributable to the unlawful use of his mark." *Id.* The Court said "[i]f it can be shown that the infringement had no relation to profits made by the defendant, that some purchasers bought goods bearing the infringing mark because of the defendant's recommendation or his reputation or for any reason other than a response to the diffused appeal of the plaintiff's symbol, the burden of showing this is upon the poacher." *Id.* But *Mishawaka* also makes clear that a windfall to plaintiff is warranted only when "isolat[ing] the profits which are attributable to the use of the infringing mark" "is impossible." *Id.*

*Mishawaka*, thus, supports nothing more than a practical inference that the mark may have contributed to some portion of profits. But it simultaneously assigns the defendant a meaningful opportunity to rebut that inference with proof showing why profits were not generated by the mark. Even then, that's not a reallocation of

the entire attribution burden to the defendant at the outset; it is a burden-shifting scheme calibrated to equity and proof.

### 2. The district court's misallocation of the attribution burden ran afoul of this Court's decisions.

Fifth Circuit cases track this analytical structure. For example, cases like *American Rice* and *Maltina* apply section 1117(a)'s evidentiary scheme as written: plaintiffs prove sales; defendants prove costs and deductions. *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 337 (5th Cir. 2008) (disallowing some expense deductions); *Maltina Corp. v. Cawy Bottling Co.*, 613 F.2d 582, 586 (5th Cir. 1980) (rejecting defendant's argument that disgorged profits should be reduced to near zero to align with defendant's taxable income based on its pass-through-tax structure). And cases like this Court's *Pebble Beach* decision confirm that profits-disgorgement is "not automatic," is "subject to the principles of equity," and is limited to profits "attributable to the unlawful use." 155 F.3d at 554-55.

On the question here the most consequential precedent is this Court's decision in *Texas Pig Stands*. Indeed, *Texas Pig Stands* is dispositive.

There, this Court affirmed the denial of disgorged profits because there was "'no basis for inferring that any of the profits received by [Hard Rock] from the sale of pig sandwiches are attributable to infringement.'" *Tex. Pig Stands II*, 966 F.2d at 957 (quoting *Tex. Pig Stands I*, 951 F.2d at 696). As the panel majority explained, the

"overriding principle" driving its decision comes from *Mishawaka*: "'The plaintiff of course, is not entitled to profits demonstrably not attributable to the unlawful use of his mark.'" *Id*. (quoting *Mishawaka*, 316 U.S. at 306). "The reason why Hard Rock Cafe's profits were not awarded was . . . based solely on the lack of evidence showing that any of Defendant's profits *were the result of its infringement of the mark*." *Id*. (emphasis in original).

Together, *Texas Pig Stands* and this Court's other decisions illustrate what *Mishawaka* contemplates: when the defendant's evidence shows the profits were not the result of the infringement—that it "would have sold just as many" absent the mark—profits may be denied. Put differently, these decisions constrain recovery to causal profits and permit denial where the defendant proves it "would have sold just as many" absent the mark or where the plaintiff offers no attribution evidence in settings where causation is not inferable.

So too, this Court's Lanham Act false-advertising decisions reinforce the principle that, to guard against windfalls, a plaintiff must show causation. A Lanham Act plaintiff must present evidence of attribution—that the sought-after profits were attributable to the defendant's challenged conduct; absent such evidence, disgorgement is improper. *See, e.g.*, *Ill. Tool Works, Inc. v. Rust-Oleum Corp.*, 955

F.3d 512, 514-15 (5th Cir. 2020) (quoting *Logan v. Burgers Ozark Cty. Cured Hams Inc.*, 263 F.3d 447, 465 (5th Cir. 2001)); *Retractable*, 842 F.3d at 901.

The holding in those cases is grounded in trademark-infringement cases. *See, e.g., Retractable*, 842 F.3d at 901 (citing, *inter alia*, *Texas Pig Stands II*, 966 F.2d at 957). Given that pedigree, it's unsurprising that the holding in the *Retractable–Illinois Tool–Logan* line of cases has been applied in Lanham Act trademark-infringement cases. *See, e.g.*, *Rex Real Est. I, L.P. v. Rex Real Est. Exch., Inc.*, No. 1:19-cv-00696-RP, 2022 WL 21739895, at *11-12 (W.D. Tex. May 18, 2022), *aff'd in part, rev'd in part on other grounds*, 80 F.4th 607 (5th Cir. 2023).

But none of those decisions authorizes shifting the entire attribution burden to defendants merely because the plaintiff has shown sales. So it makes sense that the Fifth Circuit Pattern Jury Instruction on the "Award of Defendants' Profits" cabins the plaintiff's recovery to profits "attributable to the infringement" and treats attribution as a plaintiff-side showing, before any shift to the defendant for deductions.[6]

---

[6] The pattern instruction instructs that:

> Plaintiff's burden is to prove, by a preponderance of the evidence, Defendant's individual sales of the product bearing the infringing trademark. It also is Plaintiff's burden to prove, by a preponderance of the evidence, the amount of profits attributable to Defendant's unlawful use of its mark. Defendant then has the burden to prove by a preponderance of the evidence any costs or deductions it believes must be deducted to calculate its net profits.

Here, the district court departed from this Court's precedents by collapsing the attribution inquiry into a one-way presumption and placing the entire burden to disprove attribution on defendants. That approach inverts section 1117(a), expands *Mishawaka*'s rebuttable inference into an irrebuttable presumption, ignores section 1117(a)'s textual command that the sum of any disgorged profits must "constitute compensation and not a penalty," and disregards Fifth Circuit precedent. The court's attribution-burden allocation error warrants reversal.

### 3. Defendants' evidence rebutted any inference that profits were caused by the use of "Trojan-EV," requiring denial or substantial reduction of disgorgement.

Even if a limited *Mishawaka* inference arose, Defendants carried their burden to rebut it. TBC conceded that it presented no evidence that any of the profits are attributable to the alleged wrongful use of its marks. ROA.5838-40. Defendants, in contrast, showed that none of the profits from the sale of Trojan-EV-branded golf carts are attributable to the alleged wrongful use of TBC's marks. ROA.5880-87, 5912-13, 6062, 6119-23, 6155-57. The record showed that demand for Defendants' golf carts turned on non-mark drivers—safety features, product specifications,

---

Committee on Civil Pattern Jury Instructions, District Judges Ass'n of the Fifth Circuit, Pattern Jury Instructions (Civil Cases) Ch. 14 *Trademark Infringement*, Instruction 14.25—Award of Defendants' Profits, at 36 & n.83 (2024) (footnote omitted) (citing *Pebble Beach*, 155 F.3d at 554-55), https://www.lb5.uscourts.gov/viewer/?/juryinstructions/Fifth/2024Civil_Ch14_Trademarks.pdf.

pricing, supply availability, and channel relationships—rather than any association with TBC's battery marks.  ROA.6062, 6155.

The marketplace context confirms the same point:  TBC does not sell golf carts, the accused use appears on finished vehicles in a distinct product category, and there was undisputedly no palming off.  ROA.3730 ¶7, 5579, 5638-39.  And the record underscores the lack of a causal nexus:  no diverted sales, no record of persistent bad-faith exploitation of TBC's goodwill, and non-mark explanations for sales performance.  ROA.5880-87, 5912-13, 6062, 6119-23, 6155-57; *see supra* Sections I.B.4; II.A at 53.

That is precisely the setting in which *Texas Pig Stands* affirmed denial of profits because the evidence showed no basis to infer that any profits "*were the result of*" the infringement.  966 F.2d at 957 (emphasis in original).  Here too, as in *Texas Pig Stands*, there is "no basis for inferring that any of the profits received by [Defendants] from the sale of [Trojan-EV-branded golf carts] are attributable to infringement."  *Id.*

Awarding profits despite Defendants' showing, while relieving TBC of its causation burden, is contrary to section 1117(a), this Court's precedents, and inequitable.  An award of unattributed profits turns the statute into one of strict liability that guts the statutory command that any sum awarded be "compensation

and not a penalty." 15 U.S.C. § 1117(a). Because the court placed the entire attribution burden on Defendants and treated profits as the default remedy, it never required TBC to carry its causation burden nor credited Defendants' rebuttal as this Court's decision in *Texas Pig Stands* requires.

On this record, the only legally supportable outcome is to deny disgorgement outright or, at a minimum, to substantially reduce any award to reflect non-infringing drivers of demand and proven deductions. Equity does not permit transforming a rebuttable inference into a strict-liability profits tax.

⁂

The Court should vacate the profits award and deny TBC's request for an award of disgorged profits. Alternatively, the Court should vacate that award and remand with instructions to apply the proper burden-shifting framework.

## III.  The district court's permanent injunction is overbroad and thus violates Federal Rule of Civil Procedure 65(d).

Finally, the district court abused its discretion in fashioning its permanent injunction (ROA.4587-90) because the injunction is overbroad. So even if the liability finding is upheld, the injunction order still should be modified.

Federal Rule of Civil Procedure 65(d) provides that every order granting an injunction must (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail the act or acts restrained or required. Fed. R.

Civ. P. 65(d)(1).  An injunction violates Rule 65(d) if it is overbroad.  *E.g.*, *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016).  An injunction is overbroad if it is not narrowly tailored to remedy the specific action which gives rise to the order as determined by the substantive law at issue.  *Id*.

An equitable remedy for trademark infringement should be no broader than necessary to eliminate likelihood of confusion.  *E.g.*, *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 671-72 (5th Cir. 2000).  Here, the permanent injunction is overbroad because it is not limited to golf carts, the golf industry, or even products in which TBC's batteries are used.  Instead, it prohibits any and all uses of "the word TROJAN," permanently enjoining Defendants and their officers, agents, and attorneys (among others) from:

> (a) advertising, marketing, promoting, selling, offering for sale or authorizing any third party to advertise, market, promote, sell and offer for sale ***any goods or services*** bearing the TROJAN® Marks or ***bearing any mark containing the word TROJAN*** as an element . . . . ;
>
> * * *
>
> (e) registering or applying to register any trademark, service mark, domain name, trade name, or other source identifier or symbol of origin . . . having as an element ***the word TROJAN***;

ROA.4588-89 (emphasis added).

But TBC is not entitled to an injunction prohibiting any and all uses of "the word TROJAN."  An injunction should not be so broad that it bars lawful activities.

*E.g.*, *Diageo N. Am., Inc. v. Mexcor, Inc.*, 661 F. App'x 806, 814 (5th Cir. 2016).  And because it applies to Defendants' "attorneys," the permanent injunction purports to prohibit the undersigned's firm from ever "registering or applying to register" on behalf of any client any trademark or domain name, among other things, "having as an element the word TROJAN."

TBC has no exclusive rights in the name TROJAN in any form and in connection with any product or service; any injunction must be limited to particular infringing products or services.  *See Conan Props., Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 155 (5th Cir. 1985) (rejecting plaintiff's argument that it had exclusive rights in the name Conan in any form and in connection with any product or service); *see also All. for Good Gov't v. Coal. for Better Gov't*, 901 F.3d 498, 513-14 (5th Cir. 2018) (injunction was overbroad where it restrained defendant from using "Coalition for Better Government" in connection with endorsing candidates or its other activities); *cf. AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1547-48 (11th Cir. 1986) (noting that the injunction prohibited defendant from using a polar bear image only on a five-ounce chocolate-covered ice cream bar and thus defendant was free to use such an image on other products).  The permanent injunction's scope exceeds the findings of infringement on TBC's rights.  *See Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 300 (2d Cir. 1999) ("[t]he language of the injunction is also too broad because on its face

it would include any and all footwear," whereas "[t]he jury's verdict . . . specified 'athletic footwear'").

The district court thus abused its discretion. *See Conan*, 752 F.2d at 155 (defendant's use of trade name on restaurants outside Austin posed no legally significant threat to plaintiff's mark); *All. for Good Gov't*, 901 F.3d at 513-14 (defendant could continue to use its name provided that it disassociated the name from its current logo or developed a different logo that did not create confusion); *Starter*, 170 F.3d at 300 (vacating permanent injunction that included any and all footwear instead of only athletic footwear).

## CONCLUSION

The Court should reverse and render judgment that TBC take nothing.   In the alternative, the Court should vacate the disgorgement award and modify the injunction order, *All. for Good Gov't*, 901 F.3d at 513-14, or reverse and remand for the district court to do so. *Conan*, 752 F.2d at 156.   Defendants request other appropriate relief to which they are entitled.

Respectfully submitted,

Anthony T. Golz
Cᴏᴋɪɴᴏs Yᴏᴜɴɢ, P.C.
Four Houston Center
1221 Lamar Street, 16th Floor
Houston, Texas 77010
Telephone:  (713) 535-5500
Facsimile:  (713) 535-5511
E-mail:  agolz@cokinoslaw.com

*/s/Dana Livingston*
Dana Livingston
dlivingston@cokinoslaw.com
Cᴏᴋɪɴᴏs Yᴏᴜɴɢ, P.C.
900 S. Capital of Texas Hwy., Suite
425 Austin, Texas 78746
Telephone:  (512) 482-9304 Facsimile:
(512) 610-1184

*Counsel for Defendants—Appellants,*
*Golf Carts of Cypress, LLC and*
*Trojan EV, LLC*

## CERTIFICATE OF SERVICE

I certify that, on October 27, 2025, a copy of the foregoing document was filed and served electronically through the Court's Electronic Case Filing System on lead counsel of record for Plaintiff—Appellee:

Tyler R. Marandola
tmarandola@duanemorris.com
DUANE MORRIS, LLP
30 South 17th Street
Philadelphia, PA 19103
Telephone: (215) 979-1000
Facsimile: (215) 979-1020

*Counsel for Plaintiff—Appellee*

*/s/ Dana Livingston*
Dana Livingston

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f), this document contains <u>12,997</u> words.


2.    This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365, in 14-point Equity, with the exception of footnotes, which are in 12-point Equity, as permitted by 5TH CIR. R. 32.1.

<u>*/s/ Dana Livingston*            </u>
Dana Livingston